**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOSIAH HITER,

     *Plaintiff*,                                          CASE NO. 11-CV-14561

*v.*                                                   DISTRICT JUDGE PAUL D. BORMAN
                                                       MAGISTRATE JUDGE CHARLES BINDER
COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 14.)

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff was 27 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 49.) Plaintiff's employment history includes working one year in food service, one month as an office clerk, three months as a stock worker, less than one month as a telemarketer, and work as in-store demonstrator. (Tr. at 218.) Plaintiff filed the instant claim on May 1, 2009, alleging that he became unable to work on May 1, 2002. (Tr. at 137.) The claim was denied at the initial administrative stages. (Tr. at 102.) In denying Plaintiff's claims, the Commissioner considered affective disorders and asthma as possible bases for disability. (*Id.*) On August 23, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Patricia S. McKay, who considered the application for benefits *de novo*. (Tr. at 9-22, 38-101.) In a decision dated December 2, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 22.) Plaintiff requested a review of this decision on January 31, 2011. (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, on September 10, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On October 17, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.      Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the

record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq*., and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two

4

programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the

national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since May 1, 2009, the application date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's obesity, asthma, and bipolar disorder were "severe" within the meaning of the second sequential step. (Tr. at 14.) At step three, the ALJ found that there was no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 14-16.) At step four, the ALJ found that Plaintiff was able to perform his past relevant work as a dishwasher/busser. (Tr. at 20-21.) Alternatively, at step five, the ALJ found that Plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels but needs to avoid continuous exposure to pulmonary irritants and to be limited to simple, routine, and repetitive work where he controls the pace of the work (i.e., avoid a production line work environment), which involves only occasional contact with co-workers and the general public, and which is not closely supervised. (Tr. at 16-20.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 22.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated for depression and other mental health issues since 2002. In July of that year, Plaintiff was referred to the "FACE-to-FACE" program at the New Oakland Child-Adolescent and Family Center to address his "issues of mood swings, depression and hallucinations." (Tr. at 352.) Plaintiff was assessed by Ismail B. Sendi, M.D., M.S., as having a verbal IQ of 101, performance IQ of 89, and a full scale IQ of 106, which placed him in the average, low average, and average ranges, respectively. (Tr. at 353.) Dr. Sendi concluded:

> Overall, Josiah's intellectual functioning is within the average range. He demonstrates a better ability to reason with words than without words. Josiah's

6

> MMP1-2 turned out to be uninterpretable because of extreme item endorsements. Josiah may be struggling with feelings of inadequacy. He may have a strong desire to achieve but fears that he may not. It appears that he has several layers of feelings that are difficult for him to discuss and explore. Josiah also may be having great difficulty dealing with issues concerning a history of abuse. He must have a comfortable and trusting relationship established before he will be able to address issues of insecurity, guilt and anger.

(Tr. at 355.) Dr. Sendi recommended that Plaintiff continue outpatient psychotherapy and consult with a psychiatrist upon discharge from the FACE-to-FACE program. (*Id.*) On July 25, 2002, Plaintiff was diagnosed with bipolar disorder (recurrent and severe with psychosis) and was assessed a GAF score of 30. (Tr. at 349, 378.)

Plaintiff was treated in the emergency room on August 22, 2002, for a "laceration of the right forearm"; Plaintiff indicated "that he cut himself," but "denie[d] any suicidality." (Tr. at 328.)

On September 11, 2002, Plaintiff was diagnosed with bipolar disorder (recurrent and severe) and was assessed with a GAF score of 40. (Tr. at 347, 376.) On May 13, 2003, Plaintiff was diagnosed with bipolar disorder (recurrent), depression (moderate), and dependent personality disorder and was assessed a GAF score of 40. (Tr. at 332, 374.) On July 7, 2003, Plaintiff was diagnosed with bipolar disorder and depression (severe), and was assessed a GAF score of 25. (Tr. at 337.)

On February 12, 2005, a letter was sent to the Social Security Administration by Stephanie Thompson, M.A., and Dr. Sendi. The letter listed Plaintiff's diagnoses, current GAF score of 40, and prescription medications. (Tr. at 406.) The letter indicated that Plaintiff's past attempts at employment were unsuccessful "due to mood swings resulting in irritability; recurring visual and auditory hallucinations; compulsions to shoplift; anxiety with panic feelings; depression indicated by fatigue, lack of motivation, becoming easily overwhelmed, difficulty concentrating and feelings of hopelessness." (*Id.*) The letter also indicated that Plaintiff "[c]urrently [] is unable to hold a job and it is not known when he will be able to begin working again." (*Id.*)

On April 15, 2005, a Mental Status Examination was performed by Nancy Koenig-Forbis, Ph.D., who diagnosed "Bipolar I Disorder, Most Recent Episode Depressed, Recurrent, Moderate Severity with Psychosis," "Dependent Personality Disorder," "Overweight; Hypertension; Migraines," and assessed a GAF score of 30. (Tr. at 372.) Dr. Koenig-Forbis gave a guarded prognosis, noting that "[e]mployment is difficult due to mood swings resulting in irritability, recurring visual and auditory hallucinations, compulsions to shoplift, anxiety with panic feelings, depression indicated by fatigue, lack of motivation, becoming easily overwhelmed, difficulty concentrating and feelings of hopelessness." (*Id.*) Dr. Koenig-Forbis noted that Plaintiff's speech was clear, understandable, and "[o]rganized to subject matter." (Tr. at 370.) In addition, Dr. Koenig-Forbis found that Plaintiff "had hallucinations without medications[,]" "has had delusions without medications," and is "'paranoid at times even with the meds.'" (*Id.*)

On December 8, 2008, Robert Bringman, a social worker, wrote a letter opining that Plaintiff "is unable to obtain and maintain gainful employment at this time, due to the severity of his mental illness . . .," and that "this therapist has assessed based on clinical contacts, that Mr. Hiter is totally, disabled as a result of his psychiatric disorder." (Tr. at 405.) The letter was co-signed by Dr. Savananda Sarva, a psychiatrist.

A Psychiatric Review Technique ("PRT") was completed by Ashok Kaul, M.D., on November 6, 2006, which concluded that there was insufficient evidence. (Tr. at 299-312.) On July 7, 2009, Dr. Kaul completed another PRT where he diagnosed affective disorders, but again found the evidence insufficient because Plaintiff "did not return ADL [Activities of Daily Living] forms[.]" (Tr. at 313, 325.)

On July 15, 2010, Plaintiff was informed that his case with Michigan Rehabilitation Services was "closed because of the significant barriers to employment presented by your disability." (Tr. at 280.) However, for the two sessions that he attended and worked at T. J. Maxx:

> it was noted that he returned to work promptly after break and lunch. He was able to remain on task and accurately complete duties he was assigned to perform. In addition, Mr. Hiter demonstrated appropriate hygiene and grooming for the work place.

(Tr. at 284.) However, because Plaintiff only attended for two days, rehabilitation services was "unable to adequately assess work skills and work behaviors." (*Id.*)

On July 19, 2010, Robert Bringman, social worker, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 428-29.) Bringman concluded that Plaintiff is moderately to markedly limited in the ability to understand and remember and carry out short, simple instructions, and is markedly limited in the ability to understand and remember and carry out detailed instructions. (Tr. at 428.) Bringman also concluded that Plaintiff is moderately limited in his ability to interact appropriately with the public, supervisors and co-workers, and is markedly limited in his ability to respond appropriately to work pressures and changes in a routine work setting. (Tr. at 429.) Although there are areas on the form seeking support for the assessment, i.e., medical/clinical findings, Bringman gave no specifics but instead simply stated that his conclusions were "based on professional evaluation, assessment and therapeutic sessions." (Tr. at 428-29.) Bringman also completed a Mental Residual Functional Capacity ("RFC") Assessment on the same date, concluding that Plaintiff was moderately to markedly limited in all categories of understanding, memory, sustained concentration and persistence, social interaction and adaptation. (Tr. at 430-31.)

On September 20, 2010, Plaintiff was examined by Zenia Zeer, psychologist, and Dr. Sendi, who concluded that Plaintiff's

> general cognitive ability, as estimated by the WAIS-IV is in the average range (FSIQ = 104). Josiah's verbal comprehension and perceptual reasoning abilities were both in the average range (VCI = 105, PRI = 100). Josiah's ability to sustain attention, concentrate, and exert mental control is in the low average range (WMI = 83). Due to variability between the two subtests that compose the WMI, caution is recommended when interpreting this single score and a closer look at the individual subtests is warranted. Josiah's ability in processing simple or routine visual material without making errors is in the superior range when compared to his peers (PSI = 124).

(Tr. at 467.) Dr. Sendi noted that "[t]est results are suggestive of a 'fake-bad' profile, i.e., Josiah might have made a conscious effort to appear disturbed." (*Id.*) It was recommended that Plaintiff

9

continue in outpatient therapy and that "[c]ontinued psychiatric supervision for medication intervention should be considered." (*Id.*)

Plaintiff testified at the administrative hearing that he lives with his parents and two sisters and sleeps on the second or highest floor of the house. (Tr. at 50-51.) Plaintiff finished high school where he took general education classes and he also attended one year of college. (Tr. at 51-52.) Plaintiff worked while in college doing in-store demonstrations for his aunt's company, stocking shelves at Kroger, and doing dishes and bussing tables at the college cafeteria to help pay college expenses. (Tr. at 53-54.) Plaintiff indicated he stopped attending college because his "symptoms all started really badly around then" and he was "also self-injuring." (Tr. at 52.) Plaintiff indicated that he no longer injures himself. (*Id.*)

Plaintiff testified that on an average day he gets up around 7:00 or 8:00 a.m., lets the dogs out, helps his mother with making the meals, continues to take care of the dogs, watches television and plays on the computer. (Tr. at 55.) When asked what he usually does on the computer, Plaintiff responded, "I'm usually on Facebook . . . I'm pretty much a Facebook addict if I do say so," explaining that he can spend eight hours a day on Facebook. (Tr. at 55-56, 60.) Plaintiff also indicated that he is able to take care of his own personal hygiene, but he "just do[es]n't think about it" and needs to be reminded to do so. (Tr. at 56.) Plaintiff stated that he is able to cook, do laundry, and clean house. (Tr. at 57-58.)

Plaintiff testified that he sees his therapist at the New Oakland Child and Adolescent Family Center "pretty much every two weeks." (Tr. at 61.) He also receives treatment for asthma and uses an inhaler when needed, but testified that he has not gone to the hospital for his asthma "in a long time." (Tr. at 61.)

When asked why he cannot work, Plaintiff responded, "I do have a lot of anxiety and I do get panic attacks to the point that I end up making myself sick with either throwing up or diarrhea and cramping and headaches and there's a lot of social anxiety, those type of things. When I, at times I do get very anxious and panicky there are sometimes hallucinations involved." (Tr. at 63.)

10

When examined by his attorney, Plaintiff testified that he also has migraine headaches, bad allergies, and a "goldfish memory, like three seconds and I forget it." (Tr. at 65-67.) Plaintiff further explained that although he mows the lawn at home, he "takes a lot of breaks" and it "becomes an all day event." (Tr. at 68.) In addition, Plaintiff indicated that he could not say how often he has full-blown panic attacks but that he has smaller ones "at least once a month maybe." (Tr. at 68.) Plaintiff added that he feels nauseous and light headed during panic attacks. (Tr. at 69.) Plaintiff recalled one panic attack he had while working doing in-store demonstrations where he "was very nervous . . . and I thought the bread was going to eat me." (*Id.*) Plaintiff also testified that he naps each day for three to four hours. (Tr. at 71.) He testified that his last in-patient stay for mental health issues was in 2003. (Tr. at 73.)

When asked by the ALJ why he was not attending college, Plaintiff responded, "[w]hen I was in college my bipolar happened," so the ALJ asked if Plaintiff was afraid that would happen again if he went to college, Plaintiff responded, "[y]es, we actually tried to do some OCC at Oakland Community College and I think I took two classes and I ended up, no I took three classes and ended up dropping two." (Tr. at 72.) When asked if he felt he could return to work, Plaintiff responded, "I do not. A lot of – I mean I'm still working on getting out of the house often, more regularly." (*Id.*) Plaintiff stated that he sees his psychiatrist "every three months" and that the "psychiatrist just gives me meds." (*Id.*) Plaintiff sees his therapist "every two weeks." (Tr. at 73.) When asked whether he thought he could ever go back to work, Plaintiff responded, "[i]t's going to take some time but I'm gearing to, at some point go back to work." (*Id.*)

Plaintiff's mother testified that she filled the social security forms out for Plaintiff

> Because he has such a hard time following directions. He has a real hard time thinking clearly. He can't, he has a tough time processing information and I knew that the forms would be very difficult for him. Actually we, I left it to him to do it and he could not do it. He didn't know what to write, he didn't know what to say, he didn't know how to formulate thoughts to put it on paper. So I filled it out for him but he was with me most of the time and he read it through and he made sure that it was what he wanted it to say but I did the paper work.

11

(Tr. at 75-76.) Plaintiff's mother also stated that Plaintiff "does take his medications pretty much on his own regularly because he keeps them in a pill keeper but I also oversee that and make sure that he's taking them." (Tr. at 76.) Plaintiff's mother recalled an incident the previous week where Plaintiff's medication was changed to a liquid form and, because Plaintiff forgot he already had a pill form of medicine in his pill keeper, he took a double dose of that medicine. (Tr. at 77.) Plaintiff's mother stated that Plaintiff will "lash out physically" but that "it doesn't happen often but occasionally he just cannot control himself. He just gets so angry he lashes out physically." (Tr. at 77-78.) Plaintiff's mother also testified that Plaintiff "does not take care of his personal hygiene on a regular basis . . . ," that he'll "stay in his pajamas for way too long you know and because he tends to isolate himself so much he doesn't always get dressed," and that "he has to have a reason to get up and shower . . . [l]ike today he got up and showered." (Tr. at 78-79.)

Plaintiff's mother also stated that Plaintiff will go with the family to places he feels safe, such as the homes of family members or to his therapist's office, but that he "has a lot of social anxiety and if he doesn't know the people better there he tends to isolate, go into one of the other rooms and sit down and stay by himself." (Tr. at 79.) She also stated that Plaintiff went one day to Michigan Rehabilitative Services but he only "went one time and then the next day [or third day] he was sick . . . ." (Tr. at 80.) She explained that he "gets violently ill if he gets really stressed . . . he has chronic diarrhea, he has cramps, he runs fevers . . . he does get physically ill." (Tr. at 80.)  Plaintiff's mother testified that although she leaves a list of things for Plaintiff to do during the day, she has to call and remind him and "he still may or may not do them"; she believes Plaintiff is "not capable of independent living" because he would not properly care for his own hygiene or his home. (Tr. at 84.) Plaintiff's mother stated that she believes Plaintiff would miss 12 out of every 20 workdays and noted that Plaintiff was "exited" out of the rehabilitation program. (Tr. at 86.)

Plaintiff's mother testified that during Plaintiff's initial referral to a psychologist, the psychologist or therapist "felt that the problems he was having were related to some family issues

going on at that time and that they were not bipolar [issues]. Josiah said to him 'I think I'm bipolar,'" but the "therapist said, no, no, no, no you're not bipolar, you are simply depressed and so we're going to work through it that way." (Tr. at 90.) Plaintiff's mother added that Plaintiff "seemed to do okay fo his final year of high school, and then things, it all resurfaced again in college." (Tr. at 91.)

The ALJ asked the vocational expert ("VE") whether any of Plaintiff's past work would qualify as substantial gainful activity, and the VE responded that it would not. (Tr. at 92-93.) However, the work Plaintiff did at college in food service could be considered "like a work study" and would be classified as "light, unskilled" work. (Tr. at 93.) The ALJ then asked the VE to consider a person with Plaintiff's background

> with the residual capacity to perform the full range – I'm going to start with all exertional work. But with the following additional limitations. This hypothetical claimant would need to avoid continuous exposure to pulmonary irritants; would need to limit his contact with co-workers or the general public to an occasional basis as opposed to more often like frequent or constant and would do best if not closely supervised.

(Tr. at 94-95.) The VE responded that such a person could "[p]robably" perform his past work as a food service worker or at least "jobs within that general area that would accommodate such a person." (Tr. at 95.) Assuming the food service job was not past relevant work, the VE testified such a person could perform a "plethora" of jobs such as gate house guard, night watch person, and assembler/sorter, of which there are 20,000 to 30,000 available in the "greater metropolitan area[.]" (Tr. at 95-96.) The ALJ next asked the VE to consider such a hypothetical person who was also limited to

> say simple, routine, repetitive work where he would involve the control or he would control the pace of the work so he's not on a production line . . . or they might be – they might come off a conveyer system but they're not inter-related with co-workers in terms of passing it on to somebody else. They're the last one to either inspect or reject where they may be looking for, since you're working at the end of the paint line where you're working for chips, color problems, etcetera and you have a clip board and all you're doing is checking it off and tagging it if there's an issue.

(Tr. at 96-97.) When the ALJ asked the VE whether he, after hearing the testimony, believed that Plaintiff could perform that work, the VE responded that

13

there's certainly nothing exertionally that's preclusive of any job. For all [intents and] purposes, maybe environmentally there might be something in terms of, as you pointed out, avoid noxious fumes and difficult places to breath[e]. I think we're talking about all psychological issues. Obviously something occurred at some point in the development of this young man that interfered with his ability to attend the tasks, to meet the basic criteria of getting to a job on a routine and regular basis, even getting to his studies on a routine and regular basis. He has been worked with the state rehab facilities to try and overcome those issues and yet he's consistently failed to. From my perspective it means that he's not either dealt with the issues or is medicated poorly to handle the issues. And until that's done he's not going to meet the demands of full-time work. He may be able to do the job, he's certainly cognitively capable. All the testing and obviously educationally he is and I listened to him, he's obviously bright. I don't believe if you test him psychologically you're going to find anything wrong other than if it's clinical. You're not going to find it from intellectual functioning. But we do have some clinical issues here that are interfering with his ability to keep it under control and meet the basic criteria of work functioning. And until that is better controlled he'll get jobs but he won't keep them. And even in deference to mother's testimony, 12 days out of 20 is far excessive. I don't even, two days out of 20 is highly unlikely to be tolerated in terms of absenteeism.

(Tr. at 97-98.) The ALJ asked and the VE responded that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 98-99.) The VE stated that there are "in excess of 1,200 food service jobs in terms of what we call food prep, salad prep, etcetera working in a variety of restaurants." (Tr. at 99.) When asked if taking a three to four hour nap each day would preclude employment, the VE answered that it would. (Tr. at 100.)

## F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ found that Plaintiff was able to perform her past relevant work as a manager at a recreational facility. (Tr. at 23-24.) The Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b); 20 C.F.R. §404.1560(b). "If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f); 20 C.F.R. § 404.1560(b)(3). "'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than his ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, No. 99-1906,

2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

An "ALJ [is] not required to solicit testimony from a VE in reaching his conclusion" that a plaintiff is able to perform her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing 20 C.F.R. § 404.1560(b)(2) ("We *may* use the service of vocational experts . . . to help us determine whether you can do your past relevant work[.]") (emphasis in original); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work . . . .")). Should the ALJ use the services of a VE, the ALJ need only incorporate those limitations into the hypothetical question that he finds credible and supported by the record. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Alternatively, the ALJ determined that during the time Plaintiff qualified for benefits, he retained the residual functional capacity to perform a full range of work at all exertional levels, but that he needed to avoid continuous exposure to pulmonary irritants and need work that was limited to simple, routine, and repetitive tasks where he could control the pace (i.e., avoid a production line environment), where he would have only occasional contact with co-workers and the general public, and where he was not closely supervised. (Tr. at 16-20.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in the application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.   Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial

evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

More specifically, Plaintiff contends that the ALJ's credibility findings were not supported by substantial evidence (Doc. 11 at 15-23), that the ALJ improperly rejected the opinion of Plaintiff's long-standing treating therapist, Robert Bringman, where the therapist and psychiatrist worked "in conjunction" with one another (*id*. at 23-24), and that the ALJ's RFC analysis was not supported by substantial evidence because the ALJ did not find Plaintiff credible. (*Id*. at 24-25.)

### a.    Treating Medical Sources

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc. Sec.*, 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing

treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith*, 482 F.3d at 875. Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Bringman's conclusion that Plaintiff is unable to work and is disabled for social security purposes, even if it were a medical source opinion, is not entitled to any particular weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Comm'r*, 283 F. App'x 336, 341 (6th Cir. 2008); *Turner*, 381 F. App'x at 492-93. Furthermore, I suggest that Bringman's findings in the Medical Source Statement form he completed and in the RFC assessment are not the opinion of a treating source as defined in the regulations. *See* 20 C.F.R. § 404.1513(a); *Miller v. Comm'r of Soc. Sec.*, No. 1:08-CV-1022, 2010 WL 502761, at *5 (W.D. Mich. Feb. 5, 2010) (citing *Doolin v. Astrue*, No. 3:08-cv-243, 2009 WL 1212232, at *8

(S.D. Ohio May 1, 2009) ("a counselor's opinion is not entitled to controlling weight")). Plaintiff argues that although Bringman's opinion alone may not be a medical source, he worked "in conjunction" with the psychiatrist. (Doc. 11 at 23-24.) However, courts have "reject[ed] Plaintiff's invitation to find that because [the therapist] was 'working in conjunction with' [the psychiatrist] at the time of the assessment, [the therapist] should be considered a treating physician whose opinion is entitled to controlling weight." *Ramirez v. Astrue*, 803 F. Supp. 2d 1075, 1081 (C.D. Cal. 2011). Although there may be "rare circumstances where a therapist is working so closely with a doctor that the therapist's treatment is merely an extension of the doctor's," *id.*, the instant case does not present such rare circumstances. Although a co-signature is, by itself, insufficient to establish the rare circumstances necessary, *see id.* at 1082, in the instant case the opinions stated by Bringman in the Medical Source Statement form and FRC assessment are not even co-signed by Plaintiff's psychiatrist. Furthermore, Plaintiff's own statements reveal that Bringman was not "an extension" of the psychiatrist. Plaintiff stated that although he saw Bringman "every two weeks[,]" he only saw the psychiatrist "every three months"; Plaintiff also stated that the "psychiatrist just gives me meds[.]" (Tr. at 72-73.) Accordingly, I suggest that the ALJ did not err in failing to give controlling weight to Bringman's opinions.

### b.    Credibility Findings and Overall RFC Analysis

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When

weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; S.S.R. 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or, objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then considers the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." S.S.R. 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)      [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

After examining the record evidence, I conclude that substantial evidence supports the ALJ's credibility finding. The ALJ considered the appropriate factors and found that Plaintiff's complaints of disabling symptoms were not fully credible. (Tr. at 14-20.) Plaintiff's description of his symptoms was not consistent with medical findings. For example, although Plaintiff indicated he has a "goldfish memory, like three seconds and I forget it" (Tr. at 65-67), testing by Dr. Sendi showed that Plaintiff's functioning was in the average range and that his "ability in processing simple or routine visual material without making errors is in the superior range when compared to his peers." (Tr. at 467.) In addition, Dr. Sendi found Plaintiff less than credible when he stated that the "[t]est results are suggestive of a 'fake-bad' profile, i.e., Josiah might have made a conscious effort to appear disturbed." (*Id.*)

In addition, since 2003, Plaintiff's mental impairments did not require treatment beyond out-patient therapy and prescription medications. Furthermore, Dr. Koenig-Forbis found that Plaintiff's hallucinations and delusions were controlled with medicine although Plaintiff indicated he still experienced paranoia on occasion even while on the medications. (Tr. at 370.) Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I therefore conclude that the ALJ's credibility findings were supported by substantial evidence.

Finally, I suggest that the ALJ's RFC findings were in harmony with the objective record medical evidence and Plaintiff's own statements that he is able to take care of his pets, help his mother make meals, watch television, play on the computer, do laundry, and clean house, as well as his statement that he is able to take care of his own personal hygiene but he "just do[es]n't think about it" unless it is necessary, such as in preparation for the hearing. (Tr. at 55-57.) *See Griffeth*, 217 F. App'x at 429; *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with

the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER
Dated: January 3, 2013                    United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  January 3, 2013                    By    s/Patricia T. Morris
                                          Law Clerk to Magistrate Judge Binder